Filed 2/24/20; Certified for publication 3/17/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SAVE THE AGOURA CORNELL KNOLL et al., | B292246, B295112 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BS169207) |
| v. | |
| CITY OF AGOURA HILLS et al., | |
| Respondents; | |
| DORON GELFAND et al., | |
| Real Parties in Interest and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Mary H. Strobel, Judge.  Affirmed.

Gaines & Stacey, Fred Gaines and Lisa A. Weinberg for Appellants Doron Gelfand and Agoura and Cornell Roads, LP.

Advocates for the Environment, Dean Wallraff and Kathleen R. Unger for Respondents Save the Agoura Cornell Knoll and California Native Plant Society.

————————————

In this CEQA[1] action, appellants Agoura and Cornell Roads, LP (ACR) and Doron Gelfand (Gelfand) (collectively, Appellants), appeal from the trial court's judgment granting a peremptory writ of mandate that directed the City of Agoura Hills (City) to set aside its approval of a mixed-use development project, and to prepare an environmental impact report (EIR) for the project. Appellants also appeal from the trial court's post-judgment order granting attorney's fees to the petitioners in the action, Save the Agoura Cornell Knoll and California Native Plant Society (collectively, Petitioners). Among other arguments, Appellants assert that the trial court erred in concluding that the project's potentially significant environmental impacts required the preparation of an EIR rather than the mitigated negative declaration adopted by the City. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

## I. The Proposed Project

This action challenges the City's approval of a mixed-use commercial and residential development proposed by Appellants. The project, known as the Cornerstone Mixed-Use Project, proposed the development of 35 residential apartment units plus retail, restaurant, and office space on an 8.2-acre site. The project site is on an undeveloped hillside at the southeast corner of Agoura Road and Cornell Road in Agoura Hills, California.

---

[1] CEQA refers to the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) and the regulations implementing it (Cal. Code Regs., tit. 14, § 15000 et seq.) (CEQA Guidelines). Unless otherwise stated, all further statutory references are to the Public Resources Code.

The property is mostly covered with grasses and scattered oak trees, and its dominant feature is a knoll with oak trees at the corner of Agoura Road and Cornell Road.  In addition to oak trees and scrub oak habitat, the site contains both native and non-native plants, including three plant species that are considered to be rare, threatened, or endangered.  Although the site is vacant with no existing structures, commercial retail centers are located to the west, northwest, and north of the property.

The majority of the project site is located in an area covered by the Agoura Village Specific Plan (AVSP).  The portion of the site that is outside the AVSP-covered area is located in a Significant Ecological Area.  The AVSP sets forth regulations and guidelines for new developments in the planning area.  The City certified a final EIR for the AVSP in 2006, and adopted the AVSP in 2008.  As proposed, the Cornerstone Mixed-Use Project would consolidate 24 parcels into two lots, with approximately 6.23 acres in Lot 1 and 1.98 acres in Lot 2.  The area in Lot 2 would be reserved for open space in accordance with the AVSP.

## II.    Administrative Proceedings

ACR is a California limited partnership and the owner of the property located at the project site.  Gelfand is a limited partner of ACR.  Gelfand submitted applications to the City for a development permit, a conditional use permit, an oak tree permit, and a tentative parcel map for the Cornerstone Mixed-Use Project.  After reviewing various studies and reports to evaluate the potential environmental impacts, the City issued a final Initial Study-Mitigated Negative Declaration (MND) for the project in November 2016.  At a public hearing held on January 5, 2017, the Agoura Hills Planning Commission voted to approve

3

the project and adopt the MND.

The Los Angeles/Santa Monica Mountains chapter of the California Native Plant Society (CNPS), a statewide non-profit organization focused on the preservation of native California plants, appealed the Planning Commission's decision. On March 8, 2017, the Agoura Hills City Council held a public hearing on the appeal. At the close of the hearing, the City Council approved the Cornerstone Mixed-Use Project and adopted the MND. The City Council found that, based on the record before it, there was no substantial evidence that the project would have a significant effect on the environment because the project plans incorporated feasible mitigation measures that would reduce any potential environmental impacts to a less than significant level. On March 16, 2017, the City filed a Notice of Determination of its approval of the project and adoption of the MND.

## III. Writ Proceedings

Save the Agoura Cornell Knoll (STACK), a local citizen's group, filed a verified petition for writ of mandate on April 7, 2017, and a first amended petition on August 10, 2017. The first amended petition added CNPS as a petitioner. It named the City, the Agoura Hills City Council, and the Agoura Hills Planning Commission as respondents, and ACR and Gelfand as real parties in interest. The petition alleged three causes of action for violation of CEQA, violation of planning and zoning law, and violation of the City's Oak Tree Ordinance. On January 29, 2018, Appellants and the City each filed an opposition to the petition. On February 13, 2018, Petitioners filed a reply.

The trial court held a hearing on the writ petition on March 13, and May 22, 2018. On May 23, 2018, the court issued a 64-

page decision granting in part and denying in part the petition. The court granted the petition as to the causes of action for violation of CEQA and violation of the City's Oak Tree Ordinance, and denied the petition as to the cause of action for violation of planning and zoning law. With respect to the CEQA claim, the court concluded that there was substantial evidence to support a fair argument that the project may have significant environmental impacts on cultural resources, sensitive plant species, oak trees, and aesthetic resources, and that the MND's proposed mitigation measures are inadequate to reduce those impacts to less than significant. With respect to the Oak Tree Ordinance claim, the court concluded that the permit issued by the City violated the ordinance's prohibition against the removal of more than 10 percent of the total estimated oak tree canopy or root structure on the project site.

On June 26, 2018, the trial court entered judgment in favor of Petitioners on their causes of action for violation of CEQA and violation of the Oak Tree Ordinance, and ordered the issuance of a peremptory writ of mandate. On July 20, 2018, the court issued the writ of mandate directing the City to set aside its approval of permits for the project. The writ also directed the City to set aside the MND that it had adopted for the project and to prepare an EIR in compliance with the court's May 23, 2018 decision. On August 23, 2018, Appellants filed an appeal from the judgment (Appeal B292246).

## IV. Post-Judgment Attorney's Fees

On August 24, 2018, Petitioners filed a motion to recover their attorney's fees pursuant to Code of Civil Procedure section 1021.5. Petitioners sought a total of $339,559 in attorney's fees,

5

which included a request for a lodestar multiplier of 2.0. On November 1, 2018, Appellants and the City each filed an opposition. The City opposed only the requested multiplier. Appellants contested Petitioners' entitlement to attorney's fees, the amount of fees sought, and Gelfand's individual liability for a fee award.

On November 15, 2018, the trial court partially granted the motion and found that Petitioners were entitled to attorney's fees in the amount of $142,148. The court denied Petitioners' request for a lodestar multiplier, and ordered supplemental briefing on whether Gelfand was individually liable for the fee award. On December 18, 2019, after considering the parties' supplemental briefs, the trial court found that Gelfand and ACR were jointly and severally liable for the attorney's fees. The court awarded Petitioners a total of $142,148 in attorney's fees with 50 percent payable by the City and 50 percent payable by ACR and Gelfand. On January 9, 2019, Appellants filed an appeal from the post-judgment order for attorney's fees (Appeal B295112).[2]

---

[2] On February 22, 2019, this court denied Appellants' motion to consolidate Appeals B292246 and B295112, but ordered that the appeals be considered concurrently for the purposes of oral argument and decision.

# DISCUSSION

In Appeal No. B292246, Appellants challenge the trial court's issuance of a writ of mandate directing the City to set aside its approval of the Cornerstone Mixed-Use Project and to prepare an EIR for the project. In Appeal No. B295112, they contest the trial court's post-judgment award of attorney's fees to Petitioners as the successful parties in the CEQA action.

## I. Overview Of CEQA

CEQA and the regulations implementing it "embody California's strong public policy of protecting the environment." (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285.) As the California Supreme Court has explained, "CEQA was enacted to advance four related purposes: to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382.)

"CEQA review is undertaken by a lead agency, defined as 'the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment.' [Citation.]" (*Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677, 712, italics omitted.) The lead agency's implementation of CEQA "proceeds by way of a multistep decision tree, which has been

7

characterized as having three tiers.  [Citation.]  First, the agency must determine whether the proposed activity is subject to CEQA at all.  Second, assuming CEQA is found to apply, the agency must decide whether the activity qualifies for one of the many exemptions that excuse otherwise covered activities from CEQA's environmental review.  Finally, assuming no applicable exemption, the agency must undertake environmental review of the activity. . . ." (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1185, fn. omitted.)

When a proposed activity is a project and does not qualify for a CEQA exemption, "the agency must first undertake an initial study to determine whether the project 'may have a significant effect on the environment.'  [Citations.]  If the initial study finds no substantial evidence that the project may have a significant environmental effect, the lead agency must prepare a negative declaration, and environmental review ends.  [Citations.]  If the initial study identifies potentially significant environmental effects but (1) those effects can be fully mitigated by changes in the project and (2) the project applicant agrees to incorporate those changes, the agency must prepare a mitigated negative declaration.  This too ends CEQA review.  [Citations.]  Finally, if the initial study finds substantial evidence that the project may have a significant environmental impact and a mitigated negative declaration is inappropriate, the lead agency must prepare and certify an EIR before approving or proceeding with the project.  [Citations.]" (*Union of Medical Marijuana Patients, Inc. v. City of San Diego*, *supra*, 7 Cal.5th 1171 at pp. 1186-1187; see also § 21080, subds. (c), (d).)

"At the 'heart of CEQA' [citation] is the requirement that public agencies prepare an EIR for any 'project' that 'may have a

8

significant effect on the environment.' [Citations.]" (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944.) "Given the statute's text, and its purpose of informing the public about potential environmental consequences, it is quite clear that an EIR is required even if the project's ultimate effect on the environment is far from certain. [Citations.]" (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.*, *supra*, 62 Cal.4th at pp. 382-383, italics omitted.) Accordingly, "'if a lead agency is presented with a fair argument that a project may have a significant effect on the environment, the lead agency shall prepare an EIR even though it may also be presented with other substantial evidence that the project will not have a significant effect.'" (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1111-1112, quoting CEQA Guidelines, § 15064, subd. (f)(1); see also *Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 171 ["If the agency's initial study of a project produces substantial evidence supporting a fair argument the project may have significant adverse effects, the agency must . . . prepare an EIR."].)[3]

"In reviewing an agency's . . . decision for compliance with CEQA, we ask whether the agency has prejudicially abused its discretion; such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or

---

[3] For CEQA purposes, a significant effect on the environment means "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (CEQA Guidelines, § 15382; see also §§ 21060.5, 21151, subd. (b).)

decision is not supported by substantial evidence.' ([ ] § 21168.5.) In determining whether there has been an abuse of discretion, we review the agency's action, not the trial court's decision. '[I]n that sense appellate judicial review under CEQA is de novo.' [Citation.]" (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 214-215.) We determine de novo whether the agency has employed the proper procedures, and we review the agency's substantive factual conclusions for substantial evidence. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512; *Covina Residents for Responsible Development v. City of Covina,* (2018) 21 Cal.App.5th 712, 724.)

An agency's decision to rely on a negative declaration or a mitigated negative declaration under CEQA "'is reviewed for abuse of discretion under the "fair argument" standard.'" (*Jensen v. City of Santa Rosa* (2018) 23 Cal.App.5th 877, 886; see also *Wollmer v. City of Berkeley* (2009) 179 Cal.App.4th 933, 939.) In describing the scope of judicial review of an agency's application of the fair argument standard, the Supreme Court has stated: "[A] reviewing court may not uphold an agency's decision [not to prepare an initial EIR under the fair argument test] 'merely because substantial evidence was presented that the project would not have [a significant environmental] impact. The [reviewing] court's function is to determine whether substantial evidence support[s] the agency's conclusion as to whether the prescribed "fair argument" could be made. If there [is] substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration, because it [can] be "fairly argued" that the project might have a significant environmental

10

impact. Stated another way, if the [reviewing] court perceives substantial evidence that the project might have such an impact, but the agency failed to secure preparation of the required EIR, the agency's action is to be set aside because the agency abused its discretion by failing to proceed "in a manner required by law.""" (*Berkeley Hillside Preservation v. City of Berkeley, supra,* 60 Cal.4th at p. 1112.) "The fair argument standard thus creates a low threshold for requiring an EIR, reflecting the legislative preference for resolving doubts in favor of environmental review. [Citation.]" (*Covina Residents for Responsible Development v. City of Covina, supra,* 21 Cal.App.5th at p. 723, fn. omitted.)

## II.   Exhaustion Of Administrative Remedies

As a preliminary matter, we first consider Appellants' argument that Petitioners waived any claim that they exhausted administrative remedies by failing to raise the issue in their opening brief before the trial court and instead addressing it for the first time in their reply brief. Appellants further assert that, given the purported waiver, the trial court erred in considering the evidence cited by Petitioners in their reply brief to show they had satisfied the exhaustion requirement.[4]

---

[4]     Although Appellants refer to the alleged failure to preserve the issue of exhaustion as a waiver, the proper term is forfeiture. As the Supreme Court has explained in various contexts: ""[W]aiver" means the intentional relinquishment or abandonment of a known right.' [Citations.] … [¶] … [Waiver] differs from the related concept of forfeiture, which results when a party fails to preserve a claim by raising a timely objection. [Citation.]" (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475-476.) Therefore, "'forfeiture results from the failure to

11

## A. CEQA's Exhaustion Requirement

"The rule requiring exhaustion of administrative remedies is well settled. 'In general, a party must exhaust administrative remedies before resorting to the courts. [Citations.] Under this rule, an administrative remedy is exhausted only upon "termination of all available, nonduplicative administrative review procedures." [Citations.]'" (*Williams & Fickett v. County of Fresno* (2017) 2 Cal.5th 1258, 1267-1268.) "'The rule "is not a matter of judicial discretion, but is a fundamental rule of procedure . . . binding upon all courts."' [Citation.]" (*Plantier v. Ramona Municipal Water Dist.* (2019) 7 Cal.5th 372, 383.)

"'"Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action."'" (*City of Long Beach v. City of Los Angeles* (2018) 19 Cal.App.5th 465, 474.) Section 21177 sets forth CEQA's exhaustion requirement. It provides, in relevant part, that a CEQA action "shall not be brought . . . unless the alleged grounds for noncompliance . . . were presented to the public agency orally or in writing by any person during the public comment period . . . or prior to the close of the public hearing on the project before the issuance of the notice of determination." (§ 21177, subd. (a).) "The purpose of the exhaustion doctrine is to ensure public agencies are given the opportunity to decide matters within their expertise, respond to objections, and correct any errors before the courts intervene. [Citations.]" (*Bridges v. Mt. San Jacinto Community College Dist.* (2017) 14 Cal.App.5th 104, 115; see also *Sierra Club v. City*

---

invoke a right, while waiver denotes an express relinquishment of a known right; the two are not the same.'" (*Id.* at p. 476.)

*of Orange* (2008) 163 Cal.App.4th 523, 535 ["'The rationale for exhaustion is that the agency "'is entitled to learn the contentions of interested parties before litigation is instituted. If [plaintiffs] have previously sought administrative relief . . . the [agency] will have had its opportunity to act and to render litigation unnecessary, if it had chosen to do so.'"'"].)

"'To advance the exhaustion doctrine's purpose[,] "[t]he 'exact issue' must have been presented to the administrative agency. . . ." [Citation.] While "'less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding'" . . . "generalized environmental comments at public hearings," "relatively . . . bland and general references to environmental matters" [citation], or "isolated and unelaborated comment[s]" [citation] will not suffice. The same is true for "'[g]eneral objections to project approval. . . .' [Citations.]" [Citation.] "'[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them.'"' [Citation.]" (*City of Long Beach v. City of Los Angeles*, *supra*, 19 Cal.App.5th at pp. 474-475.) "'"The petitioner bears the burden of demonstrating that the issues raised in the judicial proceeding were first raised at the administrative level. [Citation.]" [Citation.] An appellate court employs a de novo standard of review when determining whether the exhaustion of administrative remedies doctrine applies. [Citation.]' [Citation.]" (*Monterey Coastkeeper v. State Water Resources* (2018) 28 Cal.App.5th 342, 359; see also *Bridges v. Mt. San Jacinto Community College Dist.*, *supra*, 14 Cal.App.5th at pp. 116-117.)

### B. Petitioners Did Not Forfeit Their Claim That They Exhausted Administrative Remedies

The record reflects that, in the first amended petition for writ of mandate filed in the trial court, Petitioners specifically alleged that they had "performed all conditions precedent to filing this action, including exhaustion of all administrative remedies available to them." They did not address the issue of exhaustion in their opening brief to the trial court. However, in arguing that the MND failed to mitigate the project's significant impacts, Petitioners did cite some of the public comments made in the administrative proceedings, which described those impacts and disputed the adequacy of the MND's mitigation measures. After Appellants and the City argued in their opposition briefs that Petitioners had failed to prove exhaustion as to each of their claims, Petitioners then responded to this argument in their reply brief by asserting that they had exhausted administrative remedies as to the specific issues raised in their petition, and by citing the portions of the administrative record that they claimed showed this requirement had been met.

At both the March 13, 2018 and May 22, 2018 hearings on the writ petition, the trial court heard argument as to whether Petitioners had forfeited their right to establish the exhaustion of administrative remedies by failing to raise the issue in their opening brief, and if not, whether exhaustion was shown as to specific claims alleged in the petition. At the end of the March 13, 2018 hearing, the trial court denied Appellants' request to allow supplemental briefing on the arguments made at that hearing. Despite this denial, Appellants filed a supplemental brief on May 14, 2018, in which they asserted that any alleged evidence of exhaustion should not be admitted. In its May 23,

14

2018 decision, the trial court granted Petitioners' request to strike Appellants' supplemental brief for disregarding its prior order, and found that Petitioners had not forfeited the issue of exhaustion by addressing it for the first time in their reply brief. The court also found that CEQA's exhaustion requirement was satisfied as to some, but not all, of the issues raised in the petition.

Appellants contend that the trial court erred in considering any alleged evidence of exhaustion included in the administrative record because Petitioners forfeited the issue by failing to raise it in their opening brief in the writ proceedings. We conclude that this claim lacks merit. While Petitioners bore the burden of proving the exhaustion of administrative remedies, there was no jurisdictional requirement that they argue the issue in a separate section of their opening brief. Some of the evidence that Petitioners cited in their opening brief to support the merits of their CEQA claims was the same evidence that they cited in their reply to show they had exhausted administrative remedies. Petitioners adequately preserved the issue for consideration in the trial court by expressly alleging in their petition that they had exhausted all administrative remedies; by lodging the complete administrative record with the court as part of the writ proceedings; by citing the relevant portions of the administrative record that supported their claims in their opening brief; and by citing the evidence of exhaustion in their reply brief in response to Appellants' contention that exhaustion had not been shown.

As explained in *Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745, a case cited by the trial court in rejecting Appellants' forfeiture claim, "[t]he purposes of CEQA, including the provisions regarding the

15

exhaustion of administrative remedies, are not served by requiring proof in the record of compliance with the requirement that a person objecting to the [p]roject present his or her comments, orally or in writing, at the appropriate stage of the proceedings when there is no real dispute that the requirement was in fact met." (*Id*. at p. 1750.) Here, once Appellants placed the issue of exhaustion in dispute by asserting in their opposition that this requirement had not been met, Petitioners addressed the issue in their reply based on the evidentiary record before the trial court. The court then gave the parties ample opportunity over the course of two hearings to argue whether Petitioners had in fact exhausted administrative remedies as to each issue raised in the petition. Under these circumstances, Petitioners' failure to argue in their opening brief that they satisfied the exhaustion requirement as to each of their claims did not result in the forfeiture of that issue in the trial court.

None of the cases cited by Appellants in support of forfeiture compel a different conclusion. In two of the cases–*St. Mary v. Superior Court* (2014) 223 Cal.App.4th 762 and *Balboa Ins. Co. v. Aguirre* (1983) 149 Cal.App.3d 1002–the appellate court applied the well-established principle that new legal theories raised for the first time in a reply brief generally will not be considered unless good cause is shown for the failure to present them earlier. (*St. Mary v. Superior Court*, *supra*, at pp. 782-783 [defendants raised new theory for relief in reply brief filed in support of discovery motion despite representations to trial court that motion was not based on that ground]; *Balboa Ins. Co. v. Aguirre*, *supra*, at pp. 1009-1010 [plaintiff forfeited equal protection claim where issue was never raised in trial court and was asserted for first time in reply brief on appeal].) This

16

principle does not, however, preclude Petitioners from proving exhaustion of administrative remedies because that issue was not a new legal theory raised for the first time in a reply brief. Rather, as discussed, it was first alleged by Petitioners in their writ petition and then argued in their reply in direct response to the failure-to-exhaust arguments raised by Appellants and the City. The other cases on which Appellants rely–*Jay v. Mahaffey* (2013) 218 Cal.App.4th 1522 and *Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349 – are also inapposite. In each of those cases, the moving party offered new evidence with their reply papers. (*Jay v. Mahaffey*, *supra*, at p. 1538 [moving parties in anti-SLAPP motion "wait[ed] until the reply briefs to bring forth *any* evidence at all, when the [opposing parties] would have no opportunity to respond"]; *Plenger v. Alza Corp.*, *supra*, at p. 362, fn. 8 [where party moving for summary judgment offered new evidence with reply, trial court had discretion to consider such additional evidence "so long as the [opposing] party . . . ha[d] notice and an opportunity to respond"].) Here, Petitioners did not submit any new evidence of exhaustion with their reply brief, but rather cited the evidence in the already-admitted administrative record.

Appellants also have failed to show that they suffered any prejudice from the trial court's consideration of the evidence of exhaustion cited in Petitioners' reply. Appellants assert that the trial court's decision to allow such evidence while rejecting their supplemental brief deprived them of an opportunity to respond to Petitioners' claim that they satisfied the exhaustion requirement. The trial court, however, acted well within its discretion in striking Appellants' supplemental brief, which was filed in direct contravention of the court's order at the March 13, 2018 hearing where the issue of exhaustion was thoroughly argued. (*Bozzi v.*

17

*Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 765 [trial court had broad discretion to refuse to consider a "surrebuttal brief" filed without a prior court order finding good cause for the late submission].) Moreover, as Petitioners correctly note, this court independently reviews the administrative record to determine whether the exhaustion of administrative remedies doctrine applies. Given that the parties have had an opportunity to fully brief the issue of exhaustion in the appeal before this court, Appellants cannot show they were prejudiced by Petitioners' failure to argue the issue in their opening brief before the trial court. On this record, the issue of whether Petitioners exhausted their administrative remedies has not been forfeited.[5]

## III. Standing And Statute of Limitations

Notwithstanding their arguments concerning forfeiture, in their own appellate reply brief, Appellants assert for the first time that this entire action must be dismissed because STACK lacks standing to bring the action under CEQA, and CNPS is barred by the statute of limitations from serving as a substitute petitioner. With respect to standing, Appellants specifically

---

[5]  In addition to forfeiture, Appellants contend that Petitioners failed to meet their burden of proving that they exhausted administrative remedies as to the specific claims raised in their writ petition. We consider whether CEQA's exhaustion requirement was satisfied as to Petitioners' claims about the project's impacts on cultural resources, sensitive plant species, oak trees, and aesthetic resources in our discussion of each of these alleged environmental impacts. We also consider whether Petitioners exhausted administrative remedies as to their cause of action for violation of the City's Oak Tree Ordinance in our discussion of that claim.

18

argue that STACK failed to prove that either the organization or any of its members objected to the approval of the project prior to the close of the public hearing, as required by section 21177.[6] With respect to the statute of limitations, Appellants claim that CNPS cannot maintain the action because it was not named as a petitioner until the first amended petition, which was filed after the statute of limitations in section 21167 had expired.[7] Appellants contend that, in the absence of a proper petitioner, this court lacks jurisdiction to hear any of the CEQA claims.

Appellants never asserted the lack of standing or the statute of limitations in the proceedings before the trial court, nor did they argue these issues in their opening brief on appeal. In raising these issues for the first time in their reply brief, Appellants do not offer any explanation for their failure to present them earlier. Rather, they simply cite the general rule that "a contention based on a plaintiff's lack of standing cannot be waived . . . and may be raised at any time in the proceeding."

---

[6]     Section 21177, subdivision (b) states that "[a] person shall not maintain an action or proceeding unless that person objected to the approval of the project orally or in writing during the public comment period provided by this division or before the close of the public hearing on the project before the filing of notice of determination. . . ." Subdivision (c) of the statute provides that "[t]his section does not preclude any organization formed after the approval of a project from maintaining an action . . . if a member of that organization has complied with subdivision (b)."

[7]     Section 21167, subdivision (b) provides that "[a]n action or proceeding alleging that a public agency has improperly determined whether a project may have a significant effect on the environment shall be commenced within 30 days from the date of the filing of the notice [of determination]."

19

(*McKinny v. Board of Trustees* (1982) 31 Cal.3d 79, 90.) While it is true that the issue of standing can be raised at any time, including for the first time on appeal, that is not the case with the statute of limitations. "Because a statute of limitations is an affirmative defense, it is forfeited if it is not properly asserted in a general demurrer or pleaded in an answer. [Citations.]" (*PGA West Residential Assn., Inc. v. Hulven Internat., Inc.* (2017) 14 Cal.App.5th 156, 176; accord, *Minton v. Cavaney* (1961) 56 Cal.2d 576, 581.) Here, neither Appellants nor the City pleaded the statute of limitations in their respective answers to the first amended petition, nor did they assert it in a demurrer to the petition. The defense was thus forfeited. Additionally, by failing without explanation to present any argument regarding the statute of limitations in their opening brief, Appellants are precluded from raising it in their reply. (*California Building Industry Assn. v. State Water Resources* (2018) 4 Cal.5th 1032, 1050 [where appellant fails to raise an argument "until its appellate reply brief," it "has forfeited the argument"]; *Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 295, fn. 11 ["[o]bvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant"].)

Under these circumstances, we need not consider whether STACK has standing to bring this action under CEQA.[8] Even if

---

[8] Resolving the issue of STACK's standing in this case also would fall outside the proper scope of appellate review because it would require consideration of factual issues not included in the record, such as when STACK was formed and whether any of its members objected to the approval of the project during the administrative proceedings. (*Tanguilig v. Neiman Marcus Group, Inc.* (2018) 22 Cal.App.5th 313, 330 ["appellant may not raise a new theory on appeal when the theory rests on facts that

we were to assume that STACK lacks standing, Appellants do not dispute that CNPS has standing, and they have forfeited any claim that CNPS cannot maintain the action based on the statute of limitations. Because at least one of the petitioners has standing under CEQA, this court has jurisdiction over the appeal.

## IV. Impacts On Cultural Resources

In granting the writ petition on the cause of action for violation of CEQA, the trial court concluded that an EIR was required to consider the project's impacts on tribal cultural resources. Appellants argue that the trial court erred in reaching this conclusion because Petitioners failed to exhaust administrative remedies as to their cultural resource claims. Appellants further assert that, even if exhaustion was shown, there was no substantial evidence to support a fair argument that the MND's mitigation measures are insufficient to reduce the impacts on cultural resources to less than significant.

### A. Relevant Background

Prior to the arrival of the Europeans, a Native American group known as the Chumash occupied the region where the project site is located. The project site includes an identified prehistoric archaeological site, CA-LAN-1352, which consists of a surface scatter of lithic artifacts and a subsurface deposit at the

---

were . . . not fully developed in the trial court"]); *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1409 [appellate court "will not consider a new issue where the failure to raise the issue in the trial court deprived an opposing party of the opportunity to present relevant evidence"].)

21

northern end of the property. Studies of CA-LAN-1352 conducted in 1988 and 2004 determined the site represented a significant heritage resource under CEQA. In 2011, an expanded Phase II test excavation of the site concluded that it met the requirements for inclusion in the California Register of Historical Resources (CRHR) because it retained the potential to yield information important to the prehistory of the area. In 2014, Rincon Consultants, Inc. prepared a peer review of the 2011 study and concurred with that study's assessment that the site was eligible for listing in the CRHR. The 2014 peer review recommended that CA-LAN-1352 should be avoided, and if avoidance was not feasible, then a Phase III data recovery program should be conducted. It also recommended that all construction-related ground-disturbing activities should be monitored by a qualified archaeologist and a Chumash Native American representative.

In adopting the MND, the City reviewed the archaeological studies of CA-LAN-1352 conducted in 1988, 2004, and 2011, and the peer review report prepared in 2014. The City concluded that, because the project would involve extensive grading of the site to develop multiple mixed-use buildings and parking areas, the environmental impacts on cultural resources were potentially significant and would require mitigation. The MND sets forth three mitigation measures–CS-CR-1, CS-CR-2, and CS-CR-3– that the City contended would reduce the project's impacts on cultural resources to a less than significant level.

CS-CR-1 requires monitoring of the site during ground-disturbing activities. It provides, in relevant part: "Monitoring of all project related ground disturbing activities of sediments that appear to be in a primary context shall be conducted by a qualified archaeologist and/or paleontologist [and Native

22

American monitor qualified to identify Chumash and Gabrieleno resources] approved by the City Planning Department. . . . If archaeological/paleontological resources are encountered during ground-disturbing activities, the City Planning Department shall be notified immediately, and work shall stop within a 100-foot radius until the archeologist has assessed the nature, extent, and potential significance of any remains pursuant to [CEQA]. In the event such resources are determined to be significant, appropriate actions are to be determined by the archeologist consistent with CEQA . . . and the City General Plan, in consultation with the City Planning Department."

CS-CR-2 addresses the proper notification process if any human remains are discovered at the site. It states, in pertinent part, that in the event human remains are discovered, "the City's Environmental Analyst and County Coroner shall be notified immediately. . . . If the human remains are determined to be prehistoric, the County Coroner shall notify the Native American Heritage Commission, which will determine and then notify the Most Likely Descendent (MLD). The MLD shall complete an inspection and make a recommendation within 48 hours of the notification. If no recommendation is received, the remains shall be interred with appropriate dignity on the property in a location not subject to future development."

CS-CR-3 mandates an excavation program if the site cannot be avoided. It provides: "If avoidance of CA-LAN-1352 is not possible, the project applicant shall complete a Phase III data recovery excavation program prior to project-related ground disturbance. The Phase III data recovery program should be completed by a professional archeologist who meets the Secretary of the Interior's Professional Qualifications Standards for

23

prehistoric archaeology . . . and include the preparation of a work plan/research design, fieldwork, laboratory analysis of recovered artifacts and ecofacts, special studies if appropriate, the preparation of a technical report, and curation of recovered materials.  The technical report shall include a mitigation monitoring and reporting plan.  The Phase III fieldwork shall be conducted by a Native American monitor qualified to identify Chumash and Gabrieleno resources."

## B. Petitioners Exhausted Administrative Remedies As To The Cultural Resource Claims

In the writ proceedings, Petitioners raised six arguments regarding the project's potential impacts on cultural resources. The trial court found Petitioners had exhausted administrative remedies as to four of the six arguments.  On appeal, Appellants assert that none of these claims were raised in the administrative proceedings.  Based on our independent review of the record, we conclude that Petitioners satisfied the exhaustion requirement as to each cultural resource claim at issue in this appeal.

Petitioners' first claim is that the MND fails to identify and analyze CA-LAN-1352 as a tribal cultural resource in accordance with sections 21074, subdivision (a) and 21082.3, subdivision (b). Section 21074 defines "tribal cultural resources" as including sites with cultural value to a California Native American tribe that are determined to be eligible for inclusion in the CRHR. (§ 21074, subd. (a)(1).)  Section 21082.3 provides that, if a project may have a significant impact on an identified tribal cultural resource, the environmental document shall discuss the impact and any feasible alternatives or mitigation measures, including measures that may be agreed upon in consultation with a

California Native American tribe that is affiliated with the geographic area of the project. (§ 21082.3, subd. (b).) While it appears that none of the public comments submitted to the City cited these specific statutory provisions, several objections were raised about the City's failure to consult with Chumash tribes on measures that could preserve the site's cultural resources.

Specifically, in a February 2016 letter to the City Council, archeologist Chester King stated: "I found no evidence of consultation with Native American tribes as required by . . . section 21083.09[9] in the MN[D]. The significance of the loss of the cultural resource to Chumash people and the possibility of mitigation of the loss needs to be determined as part of the environmental review." The letter also noted that "[n]o project alternatives are presented that result in preservation of the site." Similarly, in a February 2017 email to the City's Planning Director, a member of the Elders Council of the Santa Ynez Band of Chumash Indians wrote: "The area in which this project is being proposed is considered to be sensitive when it comes to Chumash culture. . . . What measures, in consultation with Chumash tribes, has the City of Agoura Hills Planning Dept. and the applicant made to assure and avoid impacts to cultural heritage?" At the March 2017 City Council hearing, an individual named Emily Hilfand also complained about the lack of consultation with Chumash tribes, stating: "I'm very concerned about the known impacts [to] . . . CALAN1352. The City never contacted any Chumash tribe members about this

---

**9** Section 21083.09 required the Office of Planning and Research to revise the CEQA guidelines to include separate consideration of tribal cultural resources.

25

plan." Taken together, these comments fairly apprised the City of the concern that the MND failed to adequately address project alternatives or mitigation measures that could preserve tribal cultural resources, including measures formed in consultation with the Chumash tribes. (See *Santa Clarita Organization for Planning the Environment v. City of Santa Clarita* (2011) 197 Cal.App.4th 1042, 1052 ["[d]espite the general nature" of an advocacy group's letter, it "'fairly apprised' the city of [the group's] concerns" about the proposed mitigation measure]; *California Native Plant Society v. County of El Dorado* (2009) 170 Cal.App.4th 1026, 1056 [where CNPS argued in public comments that the proposed mitigation was not adequate, it "'fairly apprised the [c]ounty' of its central claims"].)

Petitioners' three remaining claims concern CS-CR-3.[10] In the writ proceedings, Petitioners challenged this mitigation measure on the following grounds: (1) it improperly defers analysis of the project's impacts on cultural resources by failing to define the boundaries of CA-LAN-1352 and to determine the feasibility of avoidance; (2) it is insufficient to mitigate the impacts on cultural resources to a level below significant; and (3) it improperly defers formulation of a Phase III data recovery program, including a mitigation plan. The record reflects that these claims were adequately presented to the City.

Among the objections set forth in his February 2016 letter, Dr. King stated that the "project will destroy" CA-LAN-1352, that "avoidance is not feasible without changing the project footprint,"

_____

**10** Petitioners did not raise any claims regarding CS-CR-2 or the adequacy of the MND in addressing any potential discovery of human remains at the project site.

26

and that the City's MND "does not allow for consideration of alternatives." Dr. King also expressed his concern that the MND "is not adequate for environmental review" of CA-LAN-1352. He noted that an "archeological excavation of [the] site . . . is a significant undertaking," and thus, "[a] data recovery design should be a part of an environmental impact document" that would "describe the proposed excavation program and estimate its cost" and "be subject to public review." In his oral comments at the City Council hearing, Dr. King reiterated his concern that "an archaeological site is going to be destroyed." He also asserted that the MND is "totally inadequate" because studying the impacts on the site "would require a very large archeological project," but apart from referring to "data recovery," the MND does not describe "what the mitigation would be" or "what will happen to the site." At the City Council hearing, Emily Hilfand raised similar concerns about CS-CR-3's proposed excavation plan, stating: "The mitigations mentioned in the [MND] for the Cornerstone project are also insufficient. Doing a Phase 3 excavation for an archeological site is not [a] mitigation effort, it's a destructive copout. There will not be a site after this development because the hill will be taken down to bedrock as mentioned in the project [r]eports." In addition, CNPS asserted in its administrative appeal that the MND was inadequate because the boundaries of CA-LAN-1352 needed to be defined to determine the project's impact on the site. These written and oral comments were sufficient to inform the City of the alleged deficiencies in CS-CR-3, and therefore, to preserve Petitioners' claims about those deficiencies for judicial review. (See *Santa Clarita Organization for Planning the Environment v. City of Santa Clarita, supra,* 197 Cal.App.4th at pp. 1051-1052;

27

*California Native Plant Society v. County of El Dorado, supra*, 170 Cal.App.4th at p. 1056.)

### C. An EIR Is Required To Address The Project's Impacts On Cultural Resources

Appellants do not dispute that the portion of the project site that is occupied by CA-LAN-1352 meets the definition of a "tribal cultural resource" because it has yielded, or may be likely to yield, important historical information. (§ 21074, subd. (a)(1)(A).) They also do not dispute that the project may have significant impacts on the site's archeological and paleontological resources, and that mitigation is required to reduce those impacts to less than significant. Their contention on appeal is that the MND's mitigation measures "ensure that CA-LAN-1352 will be avoided and undisturbed by the Project . . . through archeological and paleontological and/or Native American expert monitoring during all ground disturbing activities." We conclude, however, that substantial evidence supports a fair argument that the MND's measures improperly defer mitigation of the project's impacts on cultural resources, and are insufficient to avoid or reduce those impacts to a less than significant level.

Generally, "'[i]t is improper to defer the formulation of mitigation measures until after project approval; instead, the determination of whether a project will have significant environmental impacts, and the formulation of measures to mitigate those impacts, must occur *before* the project is approved.' [Citations.]" (*Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 906; see also CEQA Guidelines, § 15126.4, subd. (a)(1)(B).) "[A]n exception to this general rule applies when the agency has committed itself to specific

28

performance criteria for evaluating the efficacy of the measures to be implemented in the future, and the future mitigation measures are formulated and operational before the project activity that they regulate begins.  [Citation.]"  (*Center for Biological Diversity v. Department of Conservation* (2019) 36 Cal.App.5th 210, 239.)  Thus, ""for [the] kinds of impacts for which mitigation is known to be feasible, but where practical considerations prohibit devising such measures early in the planning process . . ., the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval.""  (*Oakland Heritage Alliance v. City of Oakland*, *supra*, at p. 906.)  "Conversely, "'[i]mpermissible deferral of mitigation measures occurs when [the agency] puts off analysis or orders a report without either setting standards or demonstrating how the impact can be mitigated in the manner described. . . .""  (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 280-281.)

Appellants claim that the MND's mitigation measures are sufficient "to ensure that CA-LAN-1352 will be avoided and undisturbed" because CS-CR-1 mandates that "the tribal cultural resources will be preserved in place," while CS-CR-3 requires the completion of a data recovery program if "preservation becomes impossible."  Contrary to their contention, however, neither of these measures is designed to ensure the avoidance of CA-LAN-1352 as a tribal cultural resource.  CS-CR-1 provides for the monitoring of ground-disturbing activities with allowances for work stoppages so that "appropriate actions" can be taken for any significant archeological or paleontological resources that are discovered at the site.  CS-CR-3 in turn provides for a Phase III data recovery excavation program prior to any project-related

29

ground disturbance "[i]f avoidance of CA-LAN-1352 is not possible." Yet the MND does not set forth any analysis of whether CA-LAN-1352 can be avoided, nor does it specify any performance criteria for evaluating the feasibility of avoidance as an alternative to excavation. As the trial court observed, an important step in determining whether avoidance is feasible would be to define the boundaries of the archaeological site. However, in their 2014 peer review, Rincon Consultants noted that prior studies did not completely define the boundaries of the CA-LAN-1352, and that the boundaries would need to be defined if the site cannot be avoided by the project. There is nothing in the record to suggest that, following the 2014 peer review, the City attempted to define the boundaries of CA-LAN-1352 to determine if the site could be avoided, or that it was impractical or infeasible for the City to make this determination as part of its initial review.[11] (CEQA Guidelines, § 15126. subd. (a)(1)(B) [specific details of mitigation measure may be developed after project approval only "when it is impractical or infeasible to include those details during the project's environmental review,"

---

[11] Appellants assert the City could not identify the precise boundaries of CA-LAN-1352 in the MND because applicable law precludes the City from publicly disclosing information about the location of archaeological sites. (See CEQA Guidelines, § 15120, subd. (d); Gov. Code, § 6254, subd. (r).) However, the issue is not whether the site's boundaries should have been disclosed in the MND, but whether those boundaries should have been defined by the City to determine whether the site could be avoided. There is no indication in the record that the City sought to fully define the boundaries of CA-LAN-1352 prior to approving the project, and neither the City nor Appellants suggested otherwise in the proceedings before the trial court.

and the agency "adopts specific performance standards the mitigation will achieve"].)

On the other hand, the record contains substantial evidence to support a fair argument that avoidance of CA-LAN-1352 is not feasible based on the existing project footprint. In his February 2016 letter, Dr. King stated that he specialized in the study of the archaeology and history of Native Americans in Southern California. He had studied the archeology of the Santa Monica Mountains for 54 years. After reviewing the prior studies of CA-LAN-1352 and the MND, Dr. King opined that the "proposed Cornerstone project will destroy [the] archaeological site," and that "avoidance is not feasible without changing the project footprint." Dr. King offered a similar opinion at the City Council hearing, stating: "I'm concerned that an archaeological site is going to be destroyed by this project. The [MND] kind of skirts around this issue, says maybe it'll be destroyed. Well, if it's going to be like it's shown, the site will be destroyed. Once an archaeological site is destroyed, it can't be replaced. . . ." Dr. King's comments thus support a fair argument that the proposed monitoring of the project's extensive grading activities, as mandated by CS-CR-1, will be ineffective to avoid the site and the significant impacts to it.

If, as Dr. King opined, avoidance of CA-LAN-1352 is not feasible, then CS-CR-3 requires the implementation of a Phase III data recovery excavation program. Dr. King explained that a proper excavation of the site would be "a significant undertaking" in terms of scope and cost. However, the MND does not consider whether a large-scale excavation program of the kind described by Dr. King would be feasible, and whether alternative measures could effectively mitigate the harm caused by the loss of the site.

31

Moreover, like CS-CR-1's avoidance plan, CS-CR-3 improperly defers mitigation of the project's impacts to the site by delaying formulation of several components of the data recovery plan until some future time. CS-CR-3 simply provides a generalized list of measures to be undertaken by a qualified archaeologist and Native American monitor, but it does not set forth any performance standards or guidelines to ensure that these measures will be effective. For instance, the program calls for the future "preparation of a technical report" that "shall include a mitigation monitoring and reporting plan." Yet the MND does not explain how the undefined monitoring and reporting plan would mitigate the potentially significant effects on the site's cultural resources, nor does it specify any criteria for evaluating the efficacy of that plan. There is also no indication in the record that it was impractical or infeasible for the City to articulate specific performance criteria for these data recovery measures at the time of project approval. (See, e.g., *Preserve Wild Santee v. City of Santee*, *supra*, 210 Cal.App.4th at p. 281 [city impermissibly deferred mitigation where EIR did not state why specifying performance standards for mitigation measure "was impractical or infeasible at the time the EIR was certified"]; *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 670 [mitigation improperly deferred where "no specific criteria or standard of performance is committed to in the EIR"]; *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 792 [deferral not proper where proposed "mitigation measure does no more than require a report be prepared and followed"].)

In arguing that an EIR is not required to address the project's impacts on cultural resources, Appellants primarily

challenge the evidentiary value of the comments made by Dr. King. Appellants contend that Dr. King's comments are mere "speculation and unsubstantiated opinion." We disagree. In his letter to the City Council, Dr. King set forth his qualifications as an expert in Native American archaeology and history. He also indicated that his opinions about the project's impacts on CA-LAN-1352 were based on his review of the 2011 study of the site, the 2014 peer review, and the MND. Regardless of whether Dr. King ever personally inspected the site, he had an adequate background and knowledge base to support his opinion about the significant effects of the project on the site's cultural resources. (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928 ["expert opinion if supported by facts, even if not based on specific observations as to the site under review" may qualify as substantial evidence supporting a fair argument].)

Appellants further assert that, even if Dr. King's comments reflected a disagreement among experts over the significance of the project's impacts, the City was entitled to rely on the expertise of its own consultants, and did so by adopting the specific recommendations made by Rincon Consultants in the 2014 peer review. However, as the trial court noted, this is not a case where the experts disagreed about whether a proposed project would have a significant effect on the environment. To the contrary, Rincon Consultants opined that CA-LAN-1352 should be avoided, and that a Phase III data recovery program should be conducted if avoidance was not feasible. Dr. King agreed that data recovery would be required if the project was not reconfigured to avoid the site, but opined that the MND's proposed measure, CS-CR-3, did not provide for an adequate data recovery program to mitigate the site's loss.

33

Moreover, to the extent there was a conflict in the evidence, "'neither the lead agency nor a court may 'weigh' conflicting substantial evidence to determine whether an EIR must be prepared in the first instance.'" (*Citizens for Responsible & Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1340; see also CEAQ Guidelines, § 15064, subd. (f)(1).) "It is the function of an EIR, not a negative declaration, to resolve conflicting claims, based on substantial evidence, as to the environmental effects of a project." (*Pocket Protectors v. City of Sacramento, supra*, 124 Cal.App.4th at p. 935.) Because the record contains substantial evidence supporting a fair argument that the MND's measures are inadequate to avoid or mitigate the impacts to CA-LAN-1352 "to a point where clearly no significant effect on the environment would occur," an EIR is required to consider the project's impacts on cultural resources. (§ 21064.5.)

## V.    Impacts On Sensitive Plant Species

Appellants also challenge the trial court's conclusion that an EIR is required to consider the project's impacts on sensitive plant species. They contend that the trial court erred because the MND includes three measures that are sufficient to reduce any adverse impacts caused by project-related activities, and to offset any loss of individual plants through restoration, preservation, and enhancement efforts. They further assert that Petitioners failed to exhaust administrative remedies as to several of their claims about these mitigation measures.

### A.    Relevant Background

Three plant species considered to be rare, threatened, or endangered occur at the project site: the Agoura Hills dudleya,

34

the Lyon's pentachaeta, and the Ojai navarretia. All three plant species occur in areas zoned for project-related fuel modification activities, such as mowing, pruning, and clearing of brush.[12] Rare plant surveys of the area were conducted in 2007 and 2008 as part of the AVSP EIR. A biological resources inventory and impact analysis, which included a project site field investigation, was completed in February 2014, and a supplemental rare plant survey of the site was conducted in July 2014.

According to the results of the July 2014 survey, there are 142 Agoura Hills dudleya at the project site, including 90 within the limits of fuel modification. There is one Lyon's pentachaeta, which also is located within the limits of fuel modification. There are 74 Ojai navarretia within the limits of grading, seven within the limits of landscaping, and 163 within the limits of fuel modification. It is anticipated that the soils in the occupied areas will contain seeds of these plant species, and that the number of live individual plants at the site will vary each season depending on growing conditions. The July 2014 survey also found that all three plant species would be potentially susceptible to impacts from grading, landscaping, and/or fuel modification activities.

In adopting the MND, the City concluded that the project's potential impacts to these three plant species were significant, but mitigable through the following measures: CS-BIO-1, which discusses mitigation for the Agoura Hills dudleya and the Lyon's

---

[12] "Fuel modification involves removal of particularly flammable vegetation and replacement with more fire resistant varieties, and a fuel modification plan must be incorporated as a component of a required landscaping plan." (*Endangered Habitats League, Inc. v. County of Orange*, *supra*, 131 Cal.App.4th at p. 787, fn. 8.)

pentachaeta; CS-BIO-3, which addresses mitigation for the Ojai navarretia; and CS-BIO-2, which provides for monitoring of fuel modification activities for all three species.

### B. An EIR Is Required To Address The Project's Impacts On Sensitive Plant Species

In the writ proceedings, the trial court concluded that the evidence supported a fair argument that each of the MND's measures would be ineffective to mitigate the potentially significant impacts on the sensitive plant species occurring at the site. Based on our independent review of the record, we agree that there is substantial evidence supporting a fair argument that, even with these mitigation measures, the project may have a significant environmental impact on sensitive plant species.

### 1. CS-BIO-1

CS-BIO-1 provides for plant surveys, onsite restoration, and offsite preservation and enhancement for the Agoura Hills dudleya and the Lyon's pentachaeta. It states that, prior to the issuance of a grading permit, a qualified plant ecologist will perform surveys for listed species, including the dudleya and the pentachaeta, during the blooming period from April to June. If a state or federally listed species is found, avoidance is required unless the project applicant provides substantial documentation that avoidance would not be feasible or would compromise the objectives of the AVSP. Avoidance is defined as a minimum 200-foot setback unless an active maintenance plan is implemented. If avoidance is not feasible, a qualified ecologist will prepare a restoration plan involving salvage and replanting in coordination with applicable federal, state, and local agencies. The plan must identify the number of plants to be replanted and the methods to

be used for onsite preservation, and include a monitoring program to measure the success of the effort. The required level of success is defined as a minimum of three consecutive years of growth of a population equal to or greater than that which would be lost due to the project. The restoration plan must be submitted to the City for approval prior to the issuance of a grading permit, and must be implemented prior to completion of the project. If approved, the plan requires annual monitoring and reporting for a five-year period.

In seeking writ relief, Petitioners argued that CS-BIO-1 is inadequate in several ways, including that it improperly defers the formulation of certain mitigation efforts and fails to set forth performance criteria to ensure that mitigation would be effective. Appellants contend that these claims were never raised in the administrative proceedings. The record shows otherwise. In an October 2016 letter to the City's Planning Director, the Santa Monica Mountains Conservancy wrote that the MND's sensitive plant measures are deficient because they "are either deferred mitigation, vaguely defined, do not mitigate habitat loss, or rest on unproven sensitive species reestablishment methods." Similarly, in a March 2017 letter to the City, the environmental law firm, Chatten-Brown & Carstens (CBC), stated that these measures "are vague, deferred, or ineffective, and will not ensure the propagation of rare plant species . . . that would be required for the Project's impacts to remain at a level below significance." The letter also asserted that CS-BIO-1, in particular, improperly defers a determination of whether avoidance is feasible and fails to specify performance standards for restoration. These arguments about CB-BIO-1 accordingly were preserved for judicial review.

Appellants argue that CS-BIO-1 provides sufficient mitigation standards to protect the dudleya and pentachaeta plants occurring at the site.  However, the record contains substantial evidence to support a fair argument that this measure is inadequate to mitigate the potential impacts to these species.  First, in adopting each of the plant mitigation measures, the City relied on surveys conducted at the project site in 2007, 2008, December 2013, and July 2014.  In an August 2016 comment letter to the Planning Director, the California Department of Fish and Wildlife (CDFW) noted that these surveys were outdated, and that the most recent one was done in the summer during an ongoing drought.  According to the CDFW, botanical surveys that are older than two years and performed in conditions that do not maximize detection "may overlook the presence or actual density of some special status plant species on the [p]roject site."  The CDFW therefore recommended that "additional botanical surveys be conducted at the appropriate time of year with proper weather conditions and the results incorporated into the environmental document for review and comment."  While CS-BIO-1 calls for future surveys during the blooming period, there was no showing that it was infeasible for the City to perform these surveys prior to project approval so that the MND could provide an accurate assessment of the sensitive plant populations that may be impacted.  (CEQA Guidelines, § 15126.4, subd. (a)(1)(B).)

Second, CS-BIO-1 provides for a restoration plan involving salvage and replanting if avoidance is not feasible, but there is substantial evidence that restoration may not effectively mitigate the impacts to the dudleya and pentachaeta species.  In its letter, the CDFW explained that these species could suffer adverse

impacts from project-related construction, maintenance, and fuel modification activities. The project also could introduce invasive ant species onto the habitats occupied by these plants, which could interfere with pollination and dispersal. The CDFW further stated that the "impacts will continue to be significant because CS-BIO-1 will not result in adequate avoidance or successful mitigation. . . ." With respect to the restoration plan, the CDFW cautioned that "[c]reation or restoration using transplanting or topsoil collection should be considered experimental in nature and not be considered as a mitigation measure" for the dudleya and pentachaeta species. A similar observation was made in the 2008 AVSP EIR, which noted that "most of the attempts to re-establish Lyon's pentachaeta have failed." Based on this evidence, it can be fairly argued that restoration, whether onsite or offsite, is not an effective form of mitigation for these plant species. (*California Native Plant Society v. County of El Dorado*, *supra*, 170 Cal.App.4th at p. 1060 [substantial evidence supported fair argument that MND's plant restoration measure was inadequate where experts opined that transplanting affected species was an "experimental" and "unproven method"].)

Third, the MND defers formulation of certain components of CS-BIO-1 without setting specific performance criteria to ensure that these measures, as implemented, will be effective. For instance, CS-BIO-1 mandates a 200-foot minimum setback to avoid dudleya and pentachaeta plants found at the site unless "avoidance would not be feasible" or an "active maintenance plan is implemented for the known occurrence." Yet the MND does not specify performance standards for determining the feasibility of avoidance or for evaluating the efficacy of any maintenance

39

plan that may be adopted in lieu of the minimum buffer zone. (See *Preserve Wild Santee v. City of Santee*, *supra*, 210 Cal.App.4th at p. 281 ["'EIR is inadequate if "[t]he success or failure of mitigation efforts . . . may largely depend upon management plans that have not yet been formulated, and have not been subject to analysis and review within the EIR"'"].) Additionally, while CS-BIO-1 sets standards for measuring the success of the restoration plan, it does not provide for any feasible alternatives if those salvage and replanting efforts fail.  Because substantial evidence indicates that restoration may fail, there is a fair argument that CS-BIO-1 may be ineffective in offsetting the loss of dudleya and pentachaeta plant life at the project site.

In arguing that CS-BIO-1 provides for sufficient mitigation, Appellants contend that the City's failure to perform updated surveys prior to project approval does not reflect any deficiency in the MND.  It is true, as Appellants assert, that "an agency is not required to conduct all possible tests or exhaust all research methodologies to evaluate impacts.  Simply because an additional test may be helpful does not mean an agency must complete the test to comply with the requirements of CEQA."  (*Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 524.) On the other hand, additional testing may be required under CEQA "if the initial testing is insufficient."  (*Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1115.)  Here, the MND was based on outdated surveys taken in the midst of an ongoing drought during which, according to the CDFW, dudleya and pentachaeta plants might be difficult to detect.  Hence, the evidence supported a fair argument that an updated survey would not merely be helpful, but would be necessary to formulate an adequate mitigation measure for these affected plant species.

40

Citing the 2008 AVSP EIR, Appellants also assert that restoration of the dudleya and pentachaeta plants is feasible with an active management and maintenance plan to monitor success. However, as the trial court observed, that prior report stated that any success in replanting Lyon's pentachaeta "would only occur for as long as the management occurs," and that "a site with appropriate soils would need to be actively maintained in perpetuity." While CS-BIO-1 requires five years of annual reporting and monitoring for its restoration plan, it does not provide for active maintenance in perpetuity or alternative mitigation measures if the replanting efforts do not succeed. Moreover, while the biologists who conducted the 2013 and 2014 rare plant surveys opined that CS-BIO-1 would reduce impacts on the affected plants to a less than significant level, the CDFW offered a contrary opinion in its August 2016 comment letter. The CDFW's analysis provides substantial evidence to support a fair argument that CS-BIO-1 is inadequate to mitigate the project's potentially significant impacts to the dudleya and pentachaeta plant species. (See *California Native Plant Society v. County of El Dorado, supra,* 170 Cal.App.4th at p. 1060 [where the views of agency biologists about the ineffectiveness of MND's plant mitigation measure conflicted with those of the expert who reviewed the project for the developer, the biologists' "views were adequate to raise factual conflicts requiring resolution through an EIR"].)

### 2. CS-BIO-3

CS-BIO-3 requires onsite restoration, offsite preservation, or offsite enhancement for the Ojai navarretia. It states that the project applicant must offset the loss of individual navarretia plants at a 2:1 ratio using one of these methods or another

mitigation method approved by the City's Planning Director. A plan identifying the location and methodology for satisfying the required ratio must be submitted to the City and the CDFW. Onsite restoration would involve the collection of seed from inside the development footprint and replanting of the seed in a suitable area. Offsite preservation would consist of locating a population of Ojai navarretia containing at least two times the number of individual plants impacted by the project and preserving the population in perpetuity. Offsite enhancement would consist of locating a disturbed poor quality population of Ojai navarretia containing at least two times the number of impacted onsite plants and enhancing the conditions of the habitat to promote the long-term viability of the population. The selected plan would need to be prepared by a qualified plant ecologist and submitted to the City for approval prior to the issuance of a grading permit, and if approved, it would require maintenance and monitoring by the applicant for a minimum of five years. Offsite presentation or enhancement is permitted only if the applicant demonstrates that onsite restoration is either not feasible or not as likely to be successful as the offsite methods.

Appellants contend that Petitioners' arguments concerning the adequacy of CS-BIO-3 were not raised in the administrative proceedings. However, the record reflects that several different groups apprised the City of these issues during the public comment period. As discussed, the Santa Monica Mountains Conservancy objected to the MND's plant measures on grounds that they defer mitigation, are vaguely defined, fail to mitigate habitat loss, and rest on unproven restoration methods. At the City Council hearing, CNPS's local chapter president, Snowdy Dodson, also raised concerns about the feasibility of restoration,

42

noting: "Mitigating the loss of rare plants is next to impossible. The rarity means that they are often site-specific for soils and climate conditions. Transplanting, seed-sewing, growing in a nursery are usually not an option." In its letter to the City, CBC specifically objected to CS-BIO-3 on the grounds that it "is both impermissibly deferred and likely ineffective," and "will not mitigate the loss of the 244 individual plants." The CDFW also addressed the likely ineffectiveness of CS-BIO-3 in its comment letter. On this record, Petitioners' arguments regarding CS-BIO-3 satisfied the exhaustion requirement.

The evidence shows that, like CS-BIO-1, CS-BIO-3 may be ineffective in mitigating the project's impacts to sensitive plant species. The CDFW's stated concerns about the unreliability of the prior botanical surveys and the need for updated surveys as part of the environmental review process applied equally to the Ojai navarretia. Moreover, unlike CS-BIO-1, CS-BIO-3 does not require that any field surveys be performed prior to the issuance of a grading permit. While it is possible, as Appellants assert, that the surveys mandated by CS-BIO-1 for "listed plants" might include the Ojai navarretia, this species is not listed as endangered or threatened under state or federal law. Rather, it is considered a special-status species based on the CNPS's rare plant ranking system. Thus, there is uncertainty as to what future studies, if any, will be done to obtain accurate, up-to-date information about the site's navarretia population and how it may be impacted by the project.

Additionally, although CS-BIO-3 expressly provides that "[o]nsite restoration is preferred" over offsite alternatives, there is substantial evidence in the record that replanting the Ojai navarretia outside the project footprint may not be a feasible

43

mitigation measure.  In its comment letter, the CDFW indicated that, like the dudleya and pentachaeta species, the navarretia is at risk of adverse impacts from the project, including the possible introduction of invasive weeds and ant species that may interfere with navarretia pollinators and dispersal agents.  The CDFW further stated that the transplanting of special-status plants was uncertain and often failed, and hence, it should "not be viewed as a mitigation measure" for the Ojai navarretia.  In response to this evidence, Appellants again cite to the analysis in the 2008 AVSP EIR that active plant management could reduce the impacts to a sensitive plant species to a less than significant level.  However, as discussed, that prior analysis concerned the Lyon's pentachaeta, not the Ojai navarretia.  It also made clear that active management would need to continue in perpetuity rather than the five-year period required by CS-BIO-3.

Appellants argue that, even if onsite restoration were ineffective, CS-BIO-3 provides for offsite preservation and enhancement as alternative mitigation measures.  Petitioners assert that there is no evidence in the record to suggest that either of these measures is feasible.  Appellants, on the other hand, contend that, in the absence of evidence demonstrating that these measures are infeasible, any doubts must be resolved in favor of the City's decision.  However, under the fair argument standard, "'deference to the agency's determination is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary.'" (*Georgetown Preservation Society v. County of El Dorado* (2018) 30 Cal.App.5th 358, 370; see also *Jensen v. City of Santa Rosa*, *supra*, 23 Cal.App.5th at p. 884 [fair argument standard "'creates a low threshold requirement for initial preparation of an EIR

44

and reflects a preference for resolving doubts in favor of environmental review when the question is whether any such review is warranted'"].)  While the CDFW did not directly address the feasibility of offsite preservation or enhancement in its letter, it did state that the project's impacts to the Ojai navarretia "would continue to be significant because CS-BIO-3 will not result in adequate avoidance or successful mitigation."  The CDFW's opinion constitutes substantial evidence supporting a fair argument that, even with CS-BIO-3, the project may have a significant impact on the Ojai navarretia species.

### 3.  CS-BIO-2

CS-BIO-2 states that, prior to fuel modification activities at the project site, a qualified biologist will locate and flag all Agoura Hills dudleya, Lyon's pentachaeta, and Ojai navarretia plants within the fuel modification zone.  The biologist will also demarcate an appropriate buffer of at least 10 feet, develop and implement protocols for protecting the plants in consultation with the Los Angeles County Fire Department, and monitor all fuel modification activities in these areas.  Upon completion of each fuel modification effort, the biologist will remove the flagging that was used to demarcate the plant locations.

In the writ proceedings, Petitioners argued that CS-BIO-2 is infeasible and likely ineffective.  While Appellants contend that Petitioners failed to exhaust administrative remedies as to this claim, the record reflects that the City was fairly apprised of the concerns about the MND's mitigation of impacts to sensitive plant species in fuel modification zones.  The CDFW specifically addressed whether CB-BIO-2 would provide sufficient mitigation for these plants in its comment letter.  In its letter to the City, CBC also stated:  "The MND . . . fails to consider the Project's

45

fuel modification zone in its analysis of the Project's impacts on rare and endangered plant species. Fuel modification zones for the Project may extend hundreds of feet from the buildings. . . . Thus, without disclosure and analysis, this impact cannot have been adequately mitigated such that use of an MND is appropriate." Given these public comments, Petitioners' claims about CB-BIO-2 were adequately raised in the administrative proceedings.

In its comment letter, the CDFW expressed the following opinion about the efficacy of CB-BIO-2 as a mitigation measure: "The effects of entering into vegetative communities supporting sensitive plant species for the purposes of clearing wildfire fuel is by its nature a disruptive activity with a high probability of resulting in incidental take of special status plant species including state and federal listed species. Fuel modification also alters the ecosystem of the community and may result in direct adverse effects to special status plant species. Therefore, CDFW is concerned that Mitigation Measure CS-BIO-2 . . . will not adequately avoid direct and/or indirect impacts . . . to onsite populations of Lyon's pentachaeta, Agoura Hills dudleya, or the Ojai navarretia . . . within the proposed fuel modification zone." The CDFW's opinion supports a fair argument that CS-BIO-2 does not provide adequate mitigation for the sensitive plant species in the fuel modification zones.

In arguing that CS-BIO-2 sufficiently mitigates the impacts to these plant species, Appellants point out that the monitoring of fuel modification activities at the site will take place prior to the issuance of a grading permit and continue throughout grading and construction. However, as the trial court noted, the City's fuel modification plan for the project indicates that routine

46

maintenance activities will be conducted indefinitely.  If the monitoring required by CS-BIO-2 only occurs through project construction, then this measure may be ineffective at mitigating the impacts caused by fuel modification activities that occur after construction has ended.

In sum, there is substantial evidence supporting a fair argument that the MND's proposed measures are infeasible or inadequate to mitigate the project's impacts on the Agoura Hills dudleya, Lyon's pentachaeta, and Ojai navarretia to a less than significant level.  Accordingly, an EIR is required to address the potential impacts on these sensitive plant species.  (CEQA Guidelines, § 15065, subd. (a)(1) [EIR is required where a project "has the potential to . . . threaten to eliminate a plant or animal community [or] substantially reduce the number or restrict the range of an endangered, rare or threatened species"].)

## VI.   Impacts On Native Oak Trees

In granting writ relief, the trial court concluded that an EIR was required to consider the project's potential impacts on native oak trees present at the site.  On appeal, Appellants assert that Petitioners' claims about the impacts on oak trees are barred by their failure to exhaust administrative remedies.  They also argue that the mitigation measures in the MND are sufficient to reduce the impacts on oak trees to less than significant.

### A.    Relevant Background

Native oak trees are considered a valuable resource by the CDFW, and are protected by the City's Oak Tree Ordinance. (Agoura Hills Municipal Code (Municipal Code), Art. IX, §§ 9657-9657.5.)  The ordinance includes the City's Oak Tree Preservation

47

Guidelines, which provide for the protection and replacement of oak trees that may be disturbed or removed by development in the area.  (Municipal Code, Art. IX, Appen. A.)  The site of the project contains oak woodland consisting of valley oaks, coast live oaks, and scrub oaks, all of which are protected under the Oak Tree Preservation Guidelines.

According to the MND, there are currently 59 valley oak and coast live oak trees and 61,845 square feet of scrub oak habitat on the project site.  During project construction, 29 of the 59 valley and coast live oak trees would be removed, and six other oak trees would experience encroachment within their protected zones.  The project also would involve the removal of 21,271 square feet of scrub oak habitat.  Four oak trees that stand on the distinctive knoll at the northwest corner of the site would be preserved in a newly-constructed plaza.

In adopting the MND, the City concluded that the project would have significant impacts on the site's oak trees, but that such impacts would be reduced to less than significant with two mitigation measures, CS-BIO-9 and CS-BIO-10. CS-BIO-9 generally provides for the replacement of oak trees removed during project development, and where onsite replacement is not feasible, it allows for an in-lieu fee to be paid to the City to acquire land to plant new oak trees.  CS-BIO-10 requires that, prior to the issuance of a grading permit, the project applicant must submit an oak tree survey, an oak tree report, and an oak tree preservation program for review and approval by the City.

48

### B.	Petitioners Exhausted Administrative Remedies As To The Oak Tree Claims

In their brief before the trial court, Petitioners contended that the MND fails to adequately analyze and mitigate the project's impacts on oak trees, including water loss caused by mass grading. Petitioners also argued that the MND's mitigation measures are uncertain and ineffective, and improperly defer various aspects of mitigation such as the in-lieu fee payment. On appeal, Appellants claim that Petitioners failed to meet their burden of showing that these specific issues were presented in the administrative proceedings. We disagree.

The record reflects that the City's Oak Tree Consultant and Appellants' landscape architect each described the risk that mass grading would result in a water deficit to the oak trees at the project site. These experts also discussed the removal of scrub oaks due to fuel modification activities and the efficacy of replacing them with smaller trees. In addition, various environmental groups informed the City of their concerns about the project's impacts on oak trees and the adequacy of the MND's mitigation measures. For instance, in its appeal letter, CNPS wrote that the MND "does not adequately analyze environmental consequences to the oak population at the project site," and that "[t]he 'mitigation' for this capacious and significant take is to authorize an Oak Tree Permit, a variance, a small percentage of onsite mitigation, with [an] undisclosed and vague promise to plant oaks at an in lieu fee location." A local CNPS member reiterated these concerns at the City Council hearing, noting: "The mitigation for the oak tree removal is not consistent with the Specific Plan. It uses . . . replacement specimens that are considerably smaller. It offers no monitoring plan to ensure the

49

long-term viability of the oaks and it doesn't address the associated plants that go along with an oak community." At the same hearing, a local resident specifically complained that the mass grading required by the project would interrupt the subsurface water flow to both retained and replacement oak trees.

Other written and oral comments presented to the City questioned the adequacy of mitigation through replanting of trees and payment of an in-lieu fee. In a March 2017 letter to the City, the Conejo Oak Tree Advocates (COTA) objected to the in-lieu fee option, noting: "[T]he Mitigation Measures and Conditions allow the applicant to pay a fee in lieu of . . . replacement of destroyed trees. This possibility is a tremendous loss to your community." COTA urged the City to reconsider the measure because it would allow "eliminating 59% of City protected Valley oak and Coast Live oak trees on this site by simply paying a fee." At the City Council hearing, a member of COTA raised a similar concern about allowing the project to "pay an in lieu fee instead of replanting," and asked the City to prepare a "full EIR that offers . . . options with less impacts." In its letter to the City, CBC specifically asserted that CS-BIO-9 would not be an effective measure, stating: "CS-BIO-9 . . . permits payment of an in-lieu fee instead of replacement of the 29 trees that will be removed if space is not available for replanting. This does not mitigate the loss of oak woodlands on the site and will result in a new loss of oak trees in Agoura Hills. Even if trees are replanted onsite or offsite, grading and drainage alterations to the site will reduce the ability of replanted oak trees to survive and thrive." Considering the totality of this record, Petitioners preserved each of their oak tree claims for judicial review.

### C. An EIR Is Required To Address The Project's Impacts On Oak Trees

Appellants contend that an EIR is not necessary to consider the project's potential impacts to native oak trees because CS-BIO-9 and CS-BIO-10 provide feasible and effective measures for mitigating those impacts. We conclude, however, that there is substantial evidence supporting a fair argument that the MND does not adequately analyze the significant impacts that the project may have on the site's oak trees, nor does it effectively mitigate those potential impacts to a less than significant level.

#### 1. CS-BIO-9

CS-BIO-9 provides for the replacement of oak trees that are removed for development. It states that four oak trees will be planted to replace each tree that is approved for removal. For impacts involving 10 percent or less of oak tree removal, each oak tree must be replaced onsite with trees of the same species. For impacts involving greater than 10 percent of oak tree removal, trees must be replaced onsite or an in-lieu fee must be paid to the City to acquire land or plant new oak trees on another site. To mitigate the removal of 21,271 square feet of scrub oak habitat, at least 213 five-gallon scrub oak trees must be planted onsite. If the City's Planning Director or Oak Tree Consultant determines that the onsite planting of the required number of scrub oak trees is not feasible, then an equivalent in-lieu fee must be paid into the City's Oak Tree Mitigation Fund.

The evidence in the record supports a fair argument that CS-BIO-9 is inadequate to mitigate the significant impacts on oak trees. First, the record contains substantial evidence that mass grading from the project may cause a loss of water to both

the retained and replacement trees.  According to the 2008 Oak Tree Report prepared by Appellants' consultant:  "Mass grading of a site . . . will disrupt the natural subsurface water flowing along the bedrock and supplying moisture to the trees.  This will likely cause a water deficit to indigenous oaks of this site."  The report noted that "[i]t will be necessary to immediately respond to this problem by establishing a method for replacing this water loss."  In 2014, the City's Oak Tree Consultant similarly opined that there would be impacts to the retained oaks from the "severe alteration of underground water availability as a result of grade alteration."  The City's consultant recommended that the project arborist "provide supplemental irrigation details in order to mitigate for the loss of seasonal flow from upslope."  At the City Council hearing, an individual named Jess Thomas expressed similar concerns about "the effect of the required grading on the remaining and replacement oak trees."  Thomas explained that "mass grading severely interrupts the natural waterways underneath the earth," which would impact the ability of "all of the oak trees" on the site to survive.  Despite these risks from mass grading, CS-BIO-9 does not include any provisions for mitigating the loss of water for the retained or replacement trees.  Moreover, while the MND states that the retained oaks will have "no direct construction impacts," it fails to provide any analysis of the potential impacts to trees from the disruption of subsurface water flow.

Second, there is substantial evidence that prior efforts at oak tree restoration have failed.  In a September 2016 letter to the City's Planning Director, the Resources Conservation District of the Santa Monica Mountains reported:  "To date, there have been no successful restorations of oak woodlands.  It is relatively

easy to plant oak trees, but the extensive ecological network and soils that make a forest from those trees has been thus far impossible to recreate." In its comment letter, CBC similarly stated that [a]ttempts to recreate oak woodlands as mitigation for other developments are often unsuccessful." In addition, CNPS cautioned that planting a boxed tree from a nursery would not mitigate the loss of fauna and plant life that are part of the oak community. As the trial court noted, the MND contains no analysis showing that CS-BIO-9 would be likely to succeed in recreating or restoring the oak woodland lost to project development.

Third, the evidence supports a fair argument that CS-BIO-9 improperly defers formulation of the in-lieu fee program as an alternative to onsite tree replacement. "In-lieu fee programs . . . may offer the best solution to environmental planning challenges, by providing some certainty to developers while adequately protecting the environment. But in order to provide a lawful substitute for the 'traditional' method of mitigating CEQA impacts, that is, a project-by-project analysis, the fee program must be evaluated under CEQA. [Citation.]" (*California Native Plant Society v. County of El Dorado*, *supra*, 170 Cal.App.4th at p. 1053.) Here, CS-BIO-9 provides that the in-lieu fee payment will be used by the City to acquire land or plant oak trees on another site, preferably in close proximity to the removed trees. However, the MND does not specify the fees to be paid or the number of trees to be planted offsite, nor does it identify whether any other sites might be available to the City for the planting of new oak trees. The MND also does not contain any analysis of the feasibility of an offsite tree replacement program. Given the evidence that prior efforts to recreate oak

53

woodlands have been unsuccessful, it cannot be presumed that the offsite planting of oak trees through an in-lieu fee payment is a feasible alternative to the onsite replacement of oak trees in their native habitat. (*Id.* at p. 1059 [payment of in-lieu fee pursuant to county ordinance did not eliminate need for EIR because, "in the absence of any environmental review, [a fee ordinance] does not presumptively establish full mitigation" for a given project].)

In arguing that CS-BIO-9 adequately mitigates the impacts on oak trees, Appellants note that state law allows mitigation through funds contributed for oak tree conservation. They cite section 21083.4, subdivision (b), which states that if a county determines that a project may have a significant effect on oak woodlands, it may contribute funds to the state's Oak Woodlands Conservation Fund for the purpose of purchasing oak woodlands conservation easements. However, as the trial court pointed out, that statute applies to county contributions to a state-run fund, whereas CS-BIO-09 requires payment to the City to acquire land or locate another site to plant new trees. In any event, section 21083.4 does not relieve the City of its obligation to analyze the in-lieu fee measure under CEQA to determine if it adequately mitigates this project's impacts "to a point where clearly no significant effect on the environment would occur." (§ 21064.5.)

Appellants also assert that CS-BIO-9 provides for sufficient mitigation because it includes various requirements to maximize the viability of the replaced oak trees, such as replanting trees in their species-specific habitat, adopting a preference for planting mature oaks within the site, and mandating agency review of project plans. However, as discussed, none of the provisions in CS-BIO-9 address the risk of a subsurface water deficit due to

54

mass grading, even though the experts for both Appellants and the City opined that it was necessary to establish a method for replacing this water loss to the oak trees. The MND does not discuss this potentially significant impact, nor does it evaluate the evidence that prior attempts to restore oak woodlands have failed. (See *Nelson v. County of Kern* (2010) 190 Cal.App.4th 252, 267 [EIR required where agency "fails to gather information and undertake an adequate environmental analysis in its initial study'"]; *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 311 ["[w]here the local agency has failed to undertake an adequate initial study," it "should not be allowed to hide behind its own failure to gather relevant data"].) Based on this record, substantial evidence supports a fair argument that CS-BIO-9 is inadequate to reduce the project's impacts to oak trees to a less than significant level.[13]

---

[13] Petitioners contend that the MND also fails to analyze and mitigate the impacts to scrub oaks that may result from being replaced with smaller-sized trees and from fuel modification activities that may require extensive pruning. While the trial court found that the evidence did not support a fair argument regarding these particular contentions, it concluded that an EIR was required based on Petitioners' other oak tree claims. Because we agree that an EIR is required to consider the project's impacts on oak trees, we need not address Petitioners' specific arguments regarding the adequacy of the MND's mitigation measures for scrub oaks. In accordance with CEQA, the EIR prepared by the City must clearly identify and describe all significant effects of the project on the environment, and discuss feasible mitigation measures for each significant environmental effect that is identified. (§ 21100, subd. (b); CEQA Guidelines, §§ 15126.2, subd. (a), 15126.4, subd. (a)(1).)

### 2.    CS-BIO-10

CS-BIO-10 requires the project applicant to submit the results of an oak true survey and an oak tree report, including an oak tree preservation program, for review and approval by the City prior to the issuance of a grading permit.  The project must be developed and operated in compliance with the approved oak tree preservation program and any other conditions determined to be necessary by the City's Oak Tree Consultant.  The program must include a number of components, including restrictions on grading and construction-related activities near the driplines of trees, limits on irrigation and watering, and requirements for fencing, trenching, and pruning.  Under the program, the health of the retained oak trees must be assessed prior to construction, and any trees in a weakened condition must be treated to invigorate them.  The health of the trees also must be monitored during all phases of construction, and any problems that are detected must be properly addressed.

The record contains substantial evidence that CS-BIO-10 may not be effective in reducing the project's impacts on oak trees to less than significant.  Like CS-BIO-9, CS-BIO-10 does not address the risk that mass grading may disrupt the subsurface water flow at the project site and cause a water deficit to the site's oak trees.  Appellants claim that CS-BIO-10 is sufficient to mitigate the risk of water loss because it provides for an oak tree preservation program with several components that are designed to ensure the health of the retained oak trees.  However, the program's components are primarily aimed at protecting the oak trees from damage caused by encroachment during grading and construction.  They do not address the long-term survival of the retained or replacement oak trees whose natural source of water

56

is reduced by mass grading.  While Appellants point to the program's watering and irrigation requirements as an example of potential mitigation, those provisions actually limit the supply of water to the oak trees by prohibiting permanent irrigation and watering during the summer months.  Neither these components nor any others required by an oak tree preservation program provide for lost water to be replaced.  Because substantial evidence supports a fair argument that, even with CS-BIO-9 and CS-BIO-10, the project may have significant impacts on native oak trees, an EIR is required to address those potential impacts.

## VII.  Impacts On Aesthetic Resources

In granting the writ petition for violation of CEQA, the trial court concluded that there was substantial evidence to support a fair argument that the project may have significant impacts on the aesthetic resources of the site, and that the MND is inadequate to mitigate those impacts to less than significant. On appeal, Appellants do not challenge the merits of the trial court's ruling on the project's impacts to aesthetic resources. Rather, their sole contention is that Petitioners failed to exhaust administrative remedies as to their aesthetic resource claims.[14]

---

[14]    Appellants' reply brief includes a single, isolated reference to the merits of the Petitioners' claims.  It states that "there is no substantial evidence supporting a fair argument that significant aesthetic impacts remain."  This conclusory assertion is not accompanied by any discussion explaining why Petitioners' claims lack merit or why the trial court's ruling was incorrect. On appeal, ""the party asserting trial court error may not . . . rest on the bare assertion of error but must present argument and legal authority on each point raised.  [Citation.]"  [Citations.] When an appellant raises an issue "but fails to support it with

The MND states that "[t]he mature oak trees on the project site offer a scenic resource, with the distinct example being the knoll of oak trees on the northwestern corner of the project site." In adopting the MND, the City concluded that the potential development of this knoll was a significant impact, but was mitigatable through measure AES-3. AES-3 requires the project applicant to "avoid development, removal, or reduction . . . of that knoll," and to minimize grading and other earthwork in the area "in order to avoid substantially modifying a scenic resource." The City also concluded that the removal of oak trees at the site was a potentially significant impact, but that CS-BIO-9 and CS-BIO-10 "would reduce the visual impacts related to the removal of oak trees to a less than significant level."

In seeking writ relief, Petitioners argued that the City incorrectly had concluded that the MND's measures adequately mitigated the project's impacts on aesthetic resources. With respect to the scenic knoll, Petitioners asserted that the knoll's oak trees were at risk for harm from project construction and

reasoned argument and citations to authority, we treat the point as waived.""" (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277; see also *Public Employment Relations Bd. v. Bellflower Unified School Dist.* (2018) 29 Cal.App.5th 927, 939 [""[w]e are not bound to develop appellants' argument for them[;] . . . [t]he absence of cogent legal argument or citation to authority allows this court to treat the contention as waived""]; *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["[w]hen legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration"].) Because Appellants do not make any reasoned argument as to whether the MND adequately mitigates the project's aesthetic impacts, that issue has been forfeited.

changes in subsurface water flow caused by mass grading, and that there was no substantial evidence that any of the MND's mitigation measures, including AES-3, would effectively protect those trees. With respect to the removal of the oak trees, Petitioners argued that there was no substantial evidence that CS-BIO-9 and CS-BIO-10 would adequately mitigate the harm to scenic resources caused by the loss of the trees. Petitioners specifically contended that CS-BIO-9's allowance of a fee payment in lieu of planting new trees would not reduce the impacts on aesthetic resources at the site, and that CS-BIO-10 would not protect the long-term survival of the site's oak trees. Petitioners also noted that several of the trees to be removed were among the largest and most vigorous oaks, and that the MND did not address this significant scenic loss.

Appellants assert that none of Petitioners' claims about the project's impacts on aesthetic resources were presented in the administrative proceedings. However, our independent review of the record demonstrates that Petitioners satisfied the exhaustion requirement as to each of these claims. During the public comment period, a number of individuals and groups raised issues about the project's aesthetic impacts. For instance, in a March 2017 email to the City Council, a local resident wrote that he was "opposed to this monstrous project moving forward in its current state," and was "particularly distressed at the planned destruction of countless oak trees" because the "plants and habitat of our beautiful hills, with all of the gorgeous oaks populating these hillsides [are] what makes us unique." In a March 2017 comment letter, the group Save Open Space (SOS) stated that the project would "substantially degrade the existing visual character of the site," including its "natural steep oak

59

studded hillside" and "distinctive topographical feature which is the large natural corner knoll." At the City Council hearing, an SOS member reiterated these concerns, noting: "[T]he vast majority of the steep, . . . oak-studded hillside will be replaced by buildings which will degrade a major view for all parts of our City." She added that the "corner knoll is not being preserved." CBC also addressed the project's aesthetic impacts in its comment letter, stating that "[t]he conversion of a scenic knoll into seven three-story buildings, along with the removal of 29 trees and 95,000 cubic yards of grading will cause significant adverse impacts to the visual quality of the site."

In addition to receiving these comments about the project's adverse aesthetic impacts, the City was fairly apprised of the concerns about water loss to the oak trees from mass grading. As discussed, experts for both the City and Appellants explained that mass grading at the site could disrupt subsurface water flow to the oak trees, and recommended that a method of replacing this water loss be implemented. The City's Oak Tree Consultant, in particular, reported that the oaks on the knoll "would require supplemental irrigation" as a result of "the interruption of sheet flow from upslope." She also advised the City to reconsider removing certain valley oak trees because they were the largest and most vigorous specimens on the site. The record further reflects that the City was fairly apprised of the concern that the MND's in-lieu fee measure would not effectively mitigate the project's impacts to the oak trees. As described, COTA objected to using an in-lieu fee to replace the loss of 29 oak trees in both its written and oral comments to the City. In their respective letters to the City, CBS asserted that the in-lieu fee would "not mitigate the loss of oak woodlands on the site," and CNPS

characterized the measure as an "undisclosed and vague promise to plant oaks" at another location. On this record, Petitioners adequately exhausted administrative remedies as to each of their aesthetic resource claims.

## VIII. Violation Of Oak Tree Ordinance

In addition to the CEQA cause of action, the petition for writ of mandate alleged a cause of action for violation of the City's Oak Tree Ordinance. In granting the petition as to this claim, the trial court concluded that the oak tree permit issued by the City violated the ordinance's prohibition on the removal of more than 10 percent of the total estimated tree canopy. On appeal, Appellants do not present any argument regarding the merits of the trial court's ruling.[15] Instead, they assert that Petitioners did not raise the City's compliance with the ordinance in the administrative proceedings, and therefore, failed to exhaust their administrative remedies as to this claim.

---

[15] As with the issue of aesthetic impacts, Appellants' briefing on appeal includes a conclusory assertion that the trial court erred in finding that City's issuance of the oak tree permit violated the Oak Tree Ordinance as to the number of affected trees. However, Appellants do not make any cognizable claim of error with respect to the trial court's conclusion that the City violated the ordinance's 10-percent rule, nor do they offer any factual or legal basis for determining that there was statutory compliance. Appellants therefore have forfeit any challenge to the merits of the trial court's ruling. (*Hernandez v. First Student, Inc.*, *supra*, 37 Cal.App.5th at p. 277; *Public Employment Relations Bd. v. Bellflower Unified School Dist.*, *supra*, 29 Cal.App.5th at p. 939; *Allen v. City of Sacramento*, *supra*, 234 Cal.App.4th at p. 52.)

61

The City's Oak Tree Ordinance requires a permit to cut, prune, remove, or encroach into the protected zone of an oak tree. (Municipal Code, § 9657.5.)  An oak tree permit may be issued to a project applicant if the City finds that the continued existence of the affected oak tree prevents the development of the project; however, the applicant may not request the removal of more than 10 percent of the total estimated tree canopy or root structure of all trees on the subject property.  (*Id*. at § 9657.5, subd. (C)(3)(c).)  In seeking writ relief, Petitioners argued that the City violated the ordinance in issuing an oak tree permit for the project because, among other reasons, the permit allowed for the removal of more than 10 percent of the oak tree canopy on the project site. The trial court agreed, noting that the City's own consultant had advised the City that the project would result in the removal of 35 to 36 percent of the oak trees, and thus, exceed the amount permitted by the Oak Tree Ordinance.

Appellants contend that the issue of statutory compliance with the ordinance's 10-percent removal limitation was not presented to the City in the administrative proceedings.  The record shows, however, the City clearly was apprised of the issue. In a May 23, 2014 memorandum to the Planning Director, the Oak Tree Consultant for the City explained that her analysis showed that "36 percent of the coast live oak and valley oak trees will be removed," and that the "Municipal Code states that not more than 10 percent of the total estimated tree canopy or root structure of all trees on the site may be removed."  In a June 29, 2015 memorandum, the Oak Tree Consultant again advised the City's Planning Director that the proposed development would require the removal of 35 to 36 percent of the oak tree canopy,

and that the "overall impact therefore exceeds the impact permitted by the Zoning Code."

A number of groups and individuals also raised this issue in their oral and written comments to the City. In a March 2017 letter to the City, SOS quoted the exact language of Municipal Code section 9657.5, subdivision (C)(3)(c), and explained that "[t]he proposed development violates the 10% rule." In its appeal letter, CNPS likewise cited the relevant provision of the ordinance in asserting that "[t]he rules specify that no more than 10% of the oak population shall be removed for any project," and that the applicant "proposes removal of over 40% of all three oak species." At the City Council hearing, an SOS representative pointed out that the "proposed project is cutting down 36% of the oaks, when a maximum of 10% is allowed." Another speaker focused her remarks exclusively on the City's lack of compliance with the 10-percent rule, stating: "The maximum number of oak trees which you can authorize for removal pursuant to Zoning Code Section 9657.5 which you should have in front of you, is 10% . . ., but [what] you've been requested to approve is far greater than that. . . . Therefore, the Planning Commission erred in granting an oak tree permit allowing for more than 10% of the trees to be removed plain and simple. You do not have the right to approve a permit that violates the City's duly adopted law." Once again, Appellants' exhaustion claim lacks merit.

## IX. Award of Attorney's Fees

Appellants challenge the trial court's award of attorney's fees to Petitioners on two grounds. First, Appellants contend that Petitioners are not entitled to any attorney's fees because they failed to provide notice of the CEQA action to the Attorney

63

General in accordance with section 21167.7 and Code of Civil Procedure section 388.  Second, Appellants claim that the trial court erred in concluding that Gelfand was personally liable for 50 percent of the fee award.

## A.    Governing Law

Code of Civil Procedure section 1021.5 provides in relevant part:  "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if:  (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

Accordingly, "'[t]o obtain attorney fees under [Code of Civil Procedure] section 1021.5, the party seeking fees must show that the litigation: "'"(1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) [was necessary and] imposed a financial burden on plaintiffs which was out of proportion to their individual stake in the matter.'  [Citation.]"  [Citation.]'" [Citations.]  Because the statute states the criteria in the conjunctive, each must be satisfied to justify a fee award. [Citations.]'  [Citation.]"  (*City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 429.)

An award of attorney's fees under Code of Civil Procedure section 1021.5 generally is reviewed on appeal for abuse of

64

discretion.  (*Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 488; *Serrano v. Stefan Merli Plastering Co., Inc.* (2011) 52 Cal.4th 1018, 1025.)  "'Fees approved by the trial court are presumed to be reasonable, and the objectors must show error in the award.' [Citation.]" (*Laffitte v. Robert Half Internat. Inc., supra*, at p. 488.)  ""However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law."' [Citation.]" (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1213.)  Under some circumstances, determining whether the criteria for a fee award are satisfied may involve "a mixed question of law and fact and, if factual questions predominate, may warrant a deferential standard of review." (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1175.)

### B.  CEQA's Notice Requirement Does Not Preclude Petitioners From Recovering Attorney's Fees

Appellants argue that Petitioners cannot satisfy the necessity and financial burden criteria of Code of Civil Procedure section 1021.5 because they did not timely serve the Attorney General with a copy of their first amended petition as required by section 21167.7 and Code of Civil Procedure section 388.  Section 2116.7 states, in relevant part, that every person who brings a CEQA action "shall . . . furnish pursuant to Section 388 of the Code of Civil Procedure a copy of any amended or supplemental pleading filed by such person in such action to the Attorney General.  No relief, temporary or permanent, shall be granted until a copy of the pleading has been furnished to the Attorney General in accordance with such requirements."  Code of Civil

Procedure section 388 in turn provides that "the party filing the pleading shall furnish a copy to the Attorney General of the State of California . . . within 10 days after filing."

In this case, it is undisputed that Petitioners filed the original petition for writ of mandate on April 7, 2017, and mailed a copy of the petition to the Attorney General five days later on April 12, 2017. Petitioners filed the first amended petition on August 10, 2017; however, they did not mail a copy of that amended petition to the Attorney General until five months later on January 20, 2018. Appellants assert that Petitioners' failure to serve the Attorney General with a copy of the first amended petition within 10 days of filing precluded the trial court from granting them any relief, including attorney's fees under Code of Civil Procedure section 1021.5.

In support of this argument, Appellants cite the decision in *Schwartz v. City of Rosemead* (1984) 155 Cal.App.3d 547 (*Schwartz*). In *Schwartz*, the plaintiff successfully obtained a writ of mandate ordering the defendant city to conduct an environmental assessment pursuant to CEQA of a proposed cogeneration plant near the plaintiff's property. (*Id.* at p. 554.) In affirming the trial court's denial of the plaintiff's request for attorney's fees, the appellant court concluded that the plaintiff was not entitled to attorney's fees under Code of Civil Procedure section 1021.5 because the financial burden that he undertook in pursuing the action was not out of proportion to his personal interest in the case. (*Id.* at p. 560.) The court also concluded that the plaintiff's failure to timely serve the Attorney General with a copy of the pleadings refuted a showing of the necessity and financial burden of private enforcement. (*Id.* at pp. 560-561.) As the court explained: "[Plaintiff's] failure to comply with the

66

statutory requirements of serving a copy of his pleading to the Attorney General within 10 days of filing effectively precluded the Attorney General from exercising an informed decision regarding intervention in this action. If the Attorney General had been promptly notified of [plaintiff's] action and had decided to intervene, [plaintiff] may not have been required to pursue his lawsuit to the extent he ultimately did. The service of pleadings on the Attorney General has the effect of informing that office of the action and permits the Attorney General to lend its power, prestige, and resources to secure compliance with CEQA and other environmental laws, perhaps without the necessity of prolonged litigation. If the Attorney General is properly served and elects not to intervene, then a plaintiff's pursuit of a lawsuit becomes presumptively 'necessary.'" (*Id*. at p. 561.)

Contrary to Appellants' contention, Petitioners are not barred from recovering attorney's fees based on their failure to strictly comply with the 10-day notice requirement of section 21167.7 and Code of Civil Procedure section 388. First, as our Supreme Court has recognized, these statues do "not make such notification a prerequisite to recovering fees" under Code of Civil Procedure section 1021.5. (*Vasquez v. State of California* (2008) 45 Cal.4th 243, 258.) Instead, in determining in a particular case "whether private enforcement was sufficiently necessary to justify an award of fees, the trial court exercises its equitable discretion in light of all the relevant circumstances." (*Id*. at pp. 258-259, fn. omitted.) The *Schwarz* court likewise acknowledged that a lack of compliance with CEQA's notice requirement was not an absolute bar to attorney's fees, noting that "situations may exist where these statutory provisions

67

should not be strictly followed." (*Schwartz, supra*, 155 Cal.App.3d at p. 561.)

Second, the reasoning in *Schwarz* for denying attorney's fees does not apply to the facts of this case. In *Schwartz*, the plaintiff served the Attorney General with a copy of his pleadings 34 days after the filing of the action and only four days before the hearing on his writ petition. (*Schwartz, supra*, 155 Cal.App.3d at p. 561.) As a result, the Attorney General's office advised the defendant city that, due to the plaintiff's late service, it did not have an opportunity to conduct even a preliminary review of the petition prior to the hearing. (*Schwartz, supra*, 155 Cal.App.3d at p. 560.) Here, Petitioners served the Attorney General with a copy of their original petition five days after it was filed and 11 months before the first writ hearing. The first amended petition, which was not materially different from the original petition, was served on the Attorney General a month and a half before that hearing. The Attorney General therefore had ample time to intervene and did not do so, making private enforcement of the action necessary. (*Conservatorship of Whitley*, *supra*, 50 Cal.4th at p. 1217 ["the 'necessity . . . of private enforcement' has long been understood to mean simply that public enforcement is not available, or not sufficiently available"].)

Appellants also contend that the trial court erred in admitting a declaration from Petitioner's attorney, which described when the copies of the original and first amended petitions were mailed to the Attorney General and attached copies of those notices. Appellants objected to the declaration on the grounds that it was submitted with Petitioner's reply brief, was not part of the administrative record, and did not meet the requirements for a proof of service under Code of Civil Procedure

section 1013a.  We conclude, however, that the trial court did not abuse its discretion in admitting the challenged evidence. (*Litinsky v. Kaplan* (2019) 40 Cal.App.5th 970, 988 [trial court's ruling on the admissibility of evidence is reviewed for abuse of discretion]; accord, *Dart Industries, Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1078.)

Because Appellants first raised the issue of notice to the Attorney General in their opposition to the writ petition, Petitioners properly responded in their reply by submitting a declaration from their attorney that addressed this specific evidentiary issue.  (*Jay v. Mahaffey*, *supra*, 218 Cal.App.4th at p. 1538 [evidence submitted with reply may be admissible where it "fill[s] gaps in the evidence created by the . . . opposition"]).  Additionally, because the declaration concerned events that occurred after the administrative proceedings, the trial court had discretion to admit it as part of the writ proceedings.  (See Code Civ. Proc., § 1094.5, subd. (e) ["[w]here the court finds that there is relevant evidence that, in the exercise of reasonable diligence, could not have been produced . . ., the court may admit the evidence at the hearing on the writ"].)  Finally, the fact that the declaration did not include formal proofs of service did not render it inadmissible.  Neither section 21167.7 nor Code of Civil Procedure section 388 requires the filing of a proof of service as part of the notification procedure.  Rather, these statutes simply provide that a party bringing a CEQA action must "furnish" a copy of its pleadings to the Attorney General.  (§ 21167.7; Code Civ. Proc., § 388.)  The declaration was sufficient to show that this requirement was met.  On this record, Appellants have failed to demonstrate that the trial court erred in finding that

Petitioners were entitled to attorney's fees under Code of Civil Procedure section 1021.5.

## C. Gelfand Is Personally Liable For His Portion Of The Attorney's Fee Award

Appellants assert that, even if Petitioners were entitled to recover their attorney's fees, the trial court erred in finding that Gelfand was jointly and severally liable for half of the fee award. Appellants argue that Gelfand has no personal liability in this case because he was not the applicant or the property owner for the Cornerstone Mixed-Use Project, but rather acted solely in his representative capacity as an officer of ACR's general partner.

"Generally speaking, the opposing party liable for attorney fees under [Code of Civil Procedure] section 1021.5 has been the defendant person or agency sued, which is responsible for initiating and maintaining actions or policies that are deemed harmful to the public interest and that gave rise to the litigation. [Citations.]" (*Connerly v. State Personnel Bd.*, *supra*, 37 Cal.4th at pp. 1176-1177; accord, *Adoption of Joshua S.* (2008) 42 Cal.4th 945, 957 ["the parties against whom attorney fees should be assessed should be those responsible for the policy or practice adjudged to be harmful to the public interest"].) The designation of a person or entity as a real party in interest in a litigation does not necessarily make that person or entity an opposing party within the meaning of Code of Civil Procedure section 1021.5. (*Connerly v. State Personnel Bd.*, *supra*, 37 Cal.4th at pp. 1180-1181.) Rather, opposing parties found liable for attorney's fees under the statute typically are "either real parties in interest that [have] a direct interest in the litigation, the furtherance of which was generally at least partly responsible for the policy or

practice that gave rise to the litigation, or [are] codefendants with a direct interest intertwined with that of the principal defendant." (*Id*. at p. 1181.)  Accordingly, in the context of a mandamus proceeding, "a real party in interest . . . that has a direct interest in the litigation, more than merely an ideological or policy interest, and actively participates in the litigation is an opposing party within the meaning of Code of Civil Procedure section 1021.5 and can be liable for attorney fees under the statute." (*Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, 161; see also *San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino* (1984) 155 Cal.App.3d 738, 756 ["[w]hen a private party is a real party in interest and actively participates in litigation along with the governmental agency, it is fair for that party to bear half the fees"].)

In this case, the record demonstrates that Gelfand was a real party in interest who pursued a direct interest in the project that gave rise to the CEQA action and actively participated in the litigation.  First, Gelfand was properly named as a real party in interest in the litigation.  Section 21167.6.5 requires a petitioner in a CEQA action to name, as a real party in interest, any person who is identified as the applicant in the notice of determination. (§ 21167.6.5, subd. (a).)  It is undisputed that Gelfand was listed as the sole applicant in the City's Notice of Determination for its approval of the project and adoption of the MND.

Second, there is substantial evidence supporting a finding that Gelfand had a direct interest in the project that gave rise to the litigation.  In January 2011, a representative for ACR wrote a letter to the City in which he requested on Gelfand's behalf that the project be placed on hold while Gelfand decided how to best proceed.  The letter noted that Gelfand had been "the owner of

71

the property for the past six years," and had "diligently been designing a project intended to meet the City's objectives as set forth in the [AVSP]." In July 2013, Gelfand personally wrote a letter to the City in which he requested that the hold on the project be removed so that he could proceed with a formal application. In his letter, Gelfand identified himself as the "owner of the Cornerstone property," and listed both his name and ACR as the applicants for the project. After voting to approve the project, the Planning Commission enacted three resolutions granting entitlements for the project, each of which identified Gelfand as the applicant. In approving the project, the City Council enacted parallel resolutions that also named Gelfand as the sole project applicant. In the first amended petition, Petitioners alleged on information and belief that Gelfand and ACR were the "legal and equitable owners of the Project Site and the Applicants for the entitlements being challenged in this case." In their verified answer to the first amended petition, Gelfand and ACR admitted those specific allegations.

Third, the evidence is sufficient to support a finding that Gelfand actively participated in all stages of the litigation. In addition to filing a verified answer, Gelfand and ACR jointly filed an opposition to the writ petition, objections to evidence, a supplemental brief on issues of exhaustion and cultural resource impacts, an opposition to the motion for attorney's fees, and a supplemental brief on Gelfand's personal liability for a fee award. Both Gelfand and ACR have appealed the underlying judgment. At no time before judgment was entered did Gelfand ever dispute his status as a project applicant or as a real party in interest.

72

In arguing that Gelfand cannot be personally liable for attorney's fees, Appellants note that ACR is a California limited partnership and the sole owner of the property at issue in this case. Gelfand, on the other hand, is one of 27 limited partners in ACR, and the president of the corporation that serves as ACR's sole general partner. Appellants assert that, because Gelfand merely acted as an officer of ACR's general partner throughout the project development and approval process, he is not liable for any of ACR's obligations. However, the trial court reasonably could have inferred from the evidence that Gelfand was not acting solely in a representative capacity on behalf of ACR, but was also holding himself out as a property owner and/or project applicant. As noted, Gelfand specifically was identified as the owner of the subject property in ACR's correspondence to the City, including correspondence signed by Gelfand. Gelfand also was identified as the sole project applicant in the City's notice of determination and various resolutions granting entitlements for the project. There is no indication that Gelfand ever objected to any of those documents or sought to correct them to name ACR as the proper applicant. Instead, Gelfand participated in the administrative process leading to the City's approval of the project, and then actively litigated the merits of the CEQA action and the attorney's fee motion. Considering the totality of these circumstances, the trial court did not err in finding that ACR and Gelfand were jointly and severally liable for 50 percent of the attorney's fee award.

## DISPOSITION

The judgment is affirmed. The post-judgment order granting attorney's fees to Petitioners also is affirmed. Petitioners are to recover their costs on appeal.


ZELON, J.


We concur:


PERLUSS, P. J.


FEUER, J.

Filed 3/17/20; Order Certifying Publication

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| SAVE THE AGOURA CORNELL KNOLL et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> CITY OF AGOURA HILLS et al., <br><br> Respondents; <br><br> DORON GELFAND et al., <br><br> Real Parties in Interest and Appellants. | B292246, B295112 <br><br> (Los Angeles County Super. Ct. No. BS169207) <br><br><br> **ORDER CERTIFYING OPINION FOR PUBLICATION** |

THE COURT:

The opinion in this case filed February 24, 2020 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request by a non-party pursuant to California Rules of Court, rule 8.1120(a) for publication is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____

PERLUSS, P. J.,              ZELON, J.,              FEUER, J.